UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LISA NANARTOWICH f/k/a Lisa White,

                    Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

                    Defendant.

_____

<u>DECISION & ORDER</u>

17-CV-6096P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Lisa Nanartowich ("Nanartowich") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 5).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 11, 12). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.     Procedural Background

Nanartowich filed for DIB on September 27, 2013, alleging disability beginning on January 31, 2012, due to neck pain, lower back disc issues, knee injury, cervical spine pain, right hip pain, temporomandibular joint dysfunction ("TMJ"), right elbow pain, emotional stress and anxiety, and arthritis.  (Tr. 154, 171, 184).[1]  On November 18, 2013, the Social Security Administration denied Nanartowich's claim for benefits, finding that she was not disabled. (Tr. 80).  Nanartowich requested and was granted a hearing before Administrative Law Judge Gregory M. Hamel (the "ALJ").  (Tr. 96-97, 104-10).  The ALJ conducted a hearing on February 20, 2015.  (Tr. 30-69).  The ALJ found that Nanartowich was not disabled and was not entitled to benefits.[2]  (Tr. 9-29).

On December 12, 2016, the Appeals Council denied Nanartowich's request for review of the ALJ's decision.  (Tr. 1-6).  Nanartowich commenced this action on February 13, 2017, seeking review of the Commissioner's decision.  (Docket # 1).

### II.     Relevant Medical Evidence[3]

#### A.     Treatment Records

Treatment notes indicate that Nanartowich injured her right knee after falling on ice in May 2009 while working as a firefighter.  (Tr. 234).  To address her injuries, Nanartowich underwent an arthroscopy with partial meniscectomies in May 2009, an ACL reconstruction in

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Nanartowich filed a new claim for benefits, which was approved on May 14, 2017.  (Docket # 11-1 at 2 n.1).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

July 2009, and a debridement in March 2010. (Tr. 239, 247). After her surgeries, she received follow-up care from her orthopedic surgeon, Lucien Rouse ("Rouse"), MD. (Tr. 226). In December 2010, Nanartowich attended an appointment with Rouse complaining of ongoing pain in her right knee accompanied by occasional catching and locking of the knee. (*Id.*). An examination demonstrated full extension, flexion to 130 degrees, good stability, and patellofemoral crepitation. (*Id.*). Rouse recommended an MRI for further assessment. (*Id.*). He noted that she was working four hours per day doing deskwork, but had been unable to return to her regular duties as a firefighter. (*Id.*).

On December 13, 2010, an MRI of Nanartowich's right knee demonstrated cystic degenerative changes along her tibial tunnel, degenerative changes at the patellofemoral joint space, small joint effusion, and a small Baker's cyst. (Tr. 251-53). The MRI could not definitively exclude a meniscus tear. (*Id.*). Rouse reviewed the results of the MRI and opined that they demonstrated further tearing of the medial meniscus and arthritic changes to the patellofemoral joint. (Tr. 227). He recommended an arthroscopy with a partial medial meniscectomy and debridement, a possible loose body removal, and removal of a screw from the femoral fixation of the ACL. (*Id.*).

In January 2011, Nanartowich attended a physical therapy appointment with Megan Richards ("Richards"), DPT. (Tr. 228-29). Nanartowich reported ongoing pain and difficulty with navigating stairs, squatting, getting in and out of her vehicle, and prolonged sitting. (*Id.*). She continued to be compliant with her recommended physical therapy exercises, but her ongoing pain limited her progress. (*Id.*). Richards assessed that Nanartowich's strength had decreased since her last session, most likely due to her pain. (*Id.*). She recommended that Nanartowich follow up after her scheduled surgery. (*Id.*).

In a letter dated January 24, 2011, Rouse opined that Nanartowich had experienced good stability from her ACL repair, but worsening of her post-traumatic arthritis. (Tr. 229-30). He opined that she would not be able to return to full active unrestricted duties as a firefighter due to her inability to bear heavy loads (including wearing heavy equipment), navigate stairs, crawl, kneel, lift or jump. (*Id.*). On January 31, 2011, Rouse performed surgery on Nanartowich's right knee, including a partial lateral meniscectomy, debridement, and removal of painful hardware. (Tr. 230-32).

Nanartowich attended a postoperative appointment with Rouse on February 7, 2011. (Tr. 232-33). During the appointment, she demonstrated full extension, good quad recruitment, and only trace effusion with minimal swelling. (*Id.*). Rouse indicated that she was doing "reasonably well with pain control," but would not be able to return to work as a firefighter. (*Id.*). He opined that she would be able to engage in light duty work in a different field. (*Id.*).

Nanartowich attended physical therapy appointments with Richards in February and March 2011. (Tr. 233-36). Nanartowich reported that her pain was at a level of four out of ten and that she took ibuprofen to manage her pain. (*Id.*). She reported some numbness and tingling, and pain with activities of daily living. (*Id.*). Richards opined that she would benefit from ongoing therapy to increase her strength, range of motion, and functioning. (*Id.*). Nanartowich also attended an appointment with Rouse in March 2011. (Tr. 237). She reported experiencing ongoing pain in her right knee, but that the pain was not as sharp, painful, or frequent as it had been. (*Id.*). She also reported improvement since her surgery, including increased strength. (*Id.*). Upon examination, Nanartowich demonstrated no effusion, full extension, with significantly better quad recruitment, some tenderness, and patellofemoral

crepitation.  (*Id.*).  Rouse recommended that Nanartowich continue physical therapy and follow up with him in one month.  (*Id.*).

Nanartowich returned for an appointment with Rouse on April 14, 2011, complaining of pain in her left knee that was getting worse.  (Tr. 238-39).  An examination of her left knee demonstrated crepitation, trace effusion, tenderness, and pain.  (*Id.*).  Imaging of the knee demonstrated good preservation of the joint space and no fractures or bony abnormalities.  (*Id.*).  Rouse assessed that Nanartowich might suffer from arthritis and possibly a meniscus tear in her left knee.  (*Id.*).  He ordered an MRI for further assessment.  (*Id.*).  On May 12, 2011, Nanartowich attended an appointment with Christopher George ("George"), PA, to review the results of her MRI.  (Tr. 241).  According to George, the MRI had revealed degenerative articular cartilage changes of the left knee and a mild meniscus tear.  (*Id.*).  He recommended therapy for her left knee and, if it continued to deteriorate, possible arthritic treatment, including corticosteroid injections or viscosupplementation.  (*Id.*).

On May 26, 2011, Nanartowich attended another physical therapy session with Richards.  (Tr. 242-43).  She reported engaging in full workouts, which eliminated some of her symptoms.  (*Id.*).  She also reported experiencing some left knee pain.  (*Id.*).  Nanartowich was able to step up and down and perform a weighted squat without increased knee symptoms.  (*Id.*).  Richards recommended that she attend therapy sessions once per week.  (*Id.*).  That same day, Nanartowich attended an appointment with Rouse and reported gradual improvement with physical therapy.  (Tr. 244).  He assessed that she was improving and that she should continue attending physical therapy appointments.  (*Id.*).

On June 24, 2011, Nanartowich attended a therapy session with Richards and reported ongoing insidious right knee pain.  (Tr. 245-46).  She also indicated that she was able to

engage in aqua jogging and biking without aggravating her knee. (*Id.*). Richards recommended ongoing physical therapy. (*Id.*).

Nanartowich met with Rouse on July 11, 2011, for a Workers' Compensation permanency and scheduled loss of use assessment, having achieved maximum medical improvement on her right knee. (Tr. 246-48). Nanartowich reported continued grinding and pain in her right knee, preventing her from deep squatting, kneeling or crawling on the knee. (*Id.*). She also reported intermittent sharper, stabbing lateral pains and occasional medial pain. (*Id.*). Upon examination, Nanartowich demonstrated full extension, flexion to 130 degrees, some crepitation with active range of motion, some residual quadriceps atrophy, and negative ligament testing. (*Id.*). Rouse opined that Nanartowich suffered from thirty percent scheduled loss of use of her lower right extremity and that she was unable to return to full active firefighter duties due to her inability to carry heavy gear up and down stairs or ladders, jump from significant heights carrying heavy loads, or crawl or kneel for prolonged periods. (*Id.*). He advised her to follow up with him as needed. (*Id.*).

On October 3, 2011, Nanartowich returned for an appointment with Rouse, primarily seeking treatment for her left knee. (Tr. 248). She reported crepitation, along with aching and pain with heavy activity. (*Id.*). Rouse reviewed her MRI and noted some arthritic changes of the patella, but otherwise nothing new. (*Id.*). He recommended ongoing physical therapy exercises and long-term use of glucosamine and chondroitin. (*Id.*). Nanartowich returned for an appointment with Rouse on January 19, 2012. (Tr. 249). She indicated that she continued her exercise routine, including light weights, multiple rep low weights, and low impact aerobic workouts. (*Id.*). She was advised to follow up as needed. (*Id.*).

The treatment notes suggest that Nanartowich did not return for another appointment with Rouse until June 20, 2013. (Tr. 250-51, 256). At that time, Nanartowich reported ongoing inability to perform deep squats, lift heavy loads, kneel or crawl, but that she was able to tolerate lighter weight workouts. (*Id.*). She reported occasional swelling when engaging in heavier activity. (*Id.*). Imaging demonstrated reasonably good maintenance of joint space, although she did have some early post-traumatic arthritic changes. (*Id.*). Rouse opined that Nanartowich was managing well and advised her to follow up as needed. (*Id.*).

Nanartowich returned for another appointment with Rouse approximately one year later, on June 10, 2014. (Tr. 278-79). She reported an increase in aching pain and crepitation in her knees, with occasional swelling and sharper pains, causing her to experience difficulty performing exercises. (*Id.*). Nanartowich reported that she attempted to maintain her routines involving low-weight, multiple-rep strength training and low-impact cardio using a stationary bike or elliptical, but that her symptoms continued to worsen. (*Id.*). Rouse noted that Nanartowich had experienced temporary relief as a result of corticosteroid injections and that she had inquired about viscosupplementation and a light sleeve for sports. (*Id.*). Imaging demonstrated significant narrowing in the lateral compartment and some patellofemoral changes. (*Id.*). Rouse provided a knee sleeve and recommended viscosupplementation. (*Id.*).

Nanartowich returned in December 2014 for further evaluation of her right knee. (Tr. 276-77). She reported that she was able to walk, but needed to rest after being on her knee for extended periods and was unable to climb, squat or kneel. (*Id.*). She also reported that her knee would stiffen and ache after sitting for more than thirty minutes. (*Id.*). Upon examination, Rouse noted a three degree limit in extension and flexion limited to 110 degrees. (*Id.*). He observed trace effusion and crepitation, but no gross ligamentous instability, and a Lachman

exam was negative.  (*Id.*).  According to Rouse, Nanartowich demonstrated good stability to medial, lateral, posterolateral, and posterior laxity testing.  (*Id.*).

Rouse reviewed Nanartowich's long-term exercise plans, including discussions of appropriate exercises and the possibility of consulting a dietician.  (*Id.*).  He opined that Nanartowich eventually would require a total knee arthroplasty, but hoped that surgery could be postponed for the near future.  (*Id.*).

On June 12, 2015, Nanartowich returned for an appointment with Rouse. (Tr. 288-89).  Rouse noted her history of posterior lateral knee pain, accompanied by overall post-traumatic arthritic symptoms, aching and weakness.  (*Id.*).  Nanartowich reported experiencing an increase in anterior lateral pain.  (*Id.*).  Rouse was concerned that she may have experienced further tearing of the residual aspect of her lateral meniscus.  (*Id.*).

Upon examination, Rouse noted tenderness of the lateral joint line, pain with the lateral McMurray maneuver, significant patellofemoral crepitation, and some chronic, moderate quadriceps atrophy, although she demonstrated good quad recruitment and good stability to the Lachman exam.  (*Id.*).  He assessed that Nanartowich was experiencing ongoing symptoms of post-traumatic arthritis and potentially further tearing of the residual lateral meniscus.  (*Id.*).  He ordered an MRI for further assessment.  (*Id.*).

Nanartowich met with Rouse on June 25, 2015, to review the results of the MRI. (Tr. 294-95).  Rouse noted that Nanartowich continued to experience pain in her knee and that she took glucosamine and nonsteroidal anti-inflammatory agents to address her ongoing pain. (*Id.*).  Rouse agreed with Nanartowich's decision to avoid narcotics to address her ongoing, occasionally significant, pain, due to the chronic nature of her knee impairment.  (*Id.*).  Upon examination, he noted lateral crepitation, trace effusion, chronic lack of extension, limited

flexion, and chronic quadriceps atrophy, with a negative Lachman exam, no instability, and fair quad tone and recruitment. (*Id.*).

Rouse reviewed the MRI and indicated that it did not demonstrate any further tearing of the lateral meniscus and that her ACL graft remained intact, although he noted definite worsening of her lateral compartment arthritis, which was "markedly worse" since her prior MRI and arthroscopy, demonstrating a "continuing worsening progression of her posttraumatic arthritis." (*Id.*). Rouse assessed that there was little that could be done from an arthroscopic standpoint and opined that Nanartowich's degree of arthritis was "clearly severe enough for a total knee arthroplasty," but that Nanartowich was likely too young to undergo a total knee replacement. (*Id.*). Rouse noted that Nanartowich suffered from chronic pain, but he agreed that she should avoid addressing the pain through narcotics. (*Id.*). Given her age, he counseled against a total knee replacement, even though he assessed that she was markedly limited, and that her knee arthritis was "severe and symptomatic." (*Id.*). Rouse indicated that Nanartowich was unable to squat, kneel or crawl, and was only able to walk approximately one-half mile without a significant increase in her pain. (*Id.*). He opined that her treatment options were limited and advised her to delay a total knee replacement for as long as she could. (*Id.*).

B. **Medical Opinion Evidence**

1. **Bruce A. Barron, MD, MS**

On April 8, 2011, Bruce A. Barron ("Barron"), MD, MS, conducted a physical examination of Nanartowich in connection with her request for medical retirement. (Tr. 146). Nanartowich complained of left knee and foot pain, which she attributed to her right knee injury. (*Id.*). Barron assessed that she demonstrated a normal gait and no tenderness in her left knee or foot. (*Id.*). He opined that there was insufficient medical evidence to causally relate her left

knee and foot impairments to her right knee injury.  (*Id.*).  Barron opined that it was unlikely that

Nanartowich would be able to return to her employment as a firefighter.  (*Id.*).  He assessed that

she was sixty-six percent impaired.  (*Id.*).

### 2.　　Brighton Chiropractic

On October 16, 2013, a chiropractor from Brighton Chiropractic, who provided

treatment to Nanartowich since 1989 (but whose name is illegible), submitted a letter relating to

Nanartowich's musculoskeletal impairments.  (Tr. 257).  In the letter, the chiropractor made

clear that Nanartowich had only received treatment related to impairments in her neck and back.

(*Id.*).  According to the chiropractor, the office had provided treatment approximately eight times

per year during the previous seven years, primarily for minor complaints requiring conservative

care and not requiring any imaging.  (*Id.*).  Indeed, the letter indicated that the chiropractor had

not reviewed any of Nanartowich's x-rays or MRI's.  (*Id.*).  The chiropractor opined that the

impairments for which treatment had been provided did not cause Nanartowich to be disabled.

(*Id.*).

### 3.　　Karl Eurenius, MD

On November 11, 2013, state examiner Karl Eurenius ("Eurenius"), MD,

conducted a consultative internal medicine examination of Nanartowich.  (Tr. 264-67).

Nanartowich reported suffering from right knee pain, low back pain, left knee pain, right hip

pain, neck pain, and TMJ.  (*Id.*).  She reported some problems stemming from a work-related

right elbow injury in 2005, but that her primary impairments started after she injured her right

knee working as a firefighter in January 2009.  (*Id.*).  Despite four surgeries, Nanartowich

reported ongoing pain and swelling, and difficulty climbing stairs.  (*Id.*).  According to

Nanartowich, she experienced right hip and left knee pain due to her abnormal gait stemming

from her right knee injury. (*Id.*). Nanartowich reported that she cleaned and cooked three to four times a week, did laundry, and shopped approximately twice a week. (*Id.*). According to Nanartowich, her ability to perform these activities was limited by pain and fatigue. (*Id.*). She reportedly was able to care for her personal hygiene and for her child. (*Id.*). She reportedly enjoyed watching television, reading, caring for farm animals, and exercising. (*Id.*).

Upon examination, Eurenius noted that Nanartowich had a limp favoring the right leg and did not appear to be in acute distress. (*Id.*). She was able to perform the heel and toe walk, although she experienced some pain in her right knee, particularly when walking on her toes. (*Id.*). Nanartowich's ability to squat was limited to one-quarter of full range due to pain in her right knee. (*Id.*). She used no assistive devices and had no difficulty getting on and off the exam table, changing for the exam, or rising from her chair. (*Id.*).

Eurenius noted that Nanartowich's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (*Id.*). Eurenius found that Nanartowich's lumbar flexion was limited to eighty degrees with pain and mild tenderness in the low mid-back. (*Id.*). Her lateral flexion and rotation were full and without pain. (*Id.*). The straight leg raise was negative bilaterally and lateral flexion and rotation were full without pain. (*Id.*). Eurenius found full range of motion in the shoulders, elbows, forearms, and wrists, although there was some pain and tenderness in the right elbow. (*Id.*). He also found full range of motion in the hips, knees, and ankles bilaterally, but noted her right knee was chronically swollen with mild tenderness. (*Id.*). Eurenius assessed strength as five out of five in the upper and lower extremities and found no evidence of sensory deficits. (*Id.*). Eurenius found Nanartowich's hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally. (*Id.*).

Eurenius diagnosed Nanartowich with chronic right knee pain, and assessed moderate limitations for walking, walking on uneven ground, and climbing.  (*Id.*).

### 4.     <u>Rouse</u>

On December 30, 2014, Rouse completed a physical Residual Functional Capacity ("RFC") questionnaire.  (Tr. 272-75).  Rouse opined that Nanartowich suffered from osteoarthritis and traumatic arthroplasty of the lower leg, and assessed a poor prognosis for this permanent injury.  (*Id.*).  According to Rouse, Nanartowich experienced continuous pain and stiffness in the right knee, with crepitation, swelling, and limited extension and flexion.  (*Id.*).  Rouse assessed that Nanartowich was unable to climb, squat, kneel, walk long distances or sit more than thirty minutes, and would eventually require a total knee replacement.  (*Id.*).  He opined that Nanartowich was not a malingerer, that her pain and other symptoms were severe enough to constantly interfere with her attention and concentration, but that she was able to tolerate moderate stress.  (*Id.*).

Rouse opined that Nanartowich could sit for no more than thirty minutes at a time, could stand for no more than one hour at a time, and would be able to sit or stand and walk for less than two hours out of an eight-hour workday.  (*Id.*).  According to Rouse, Nanartowich would require approximately four unscheduled breaks during every two-hour period and was likely to be absent more than four days a month.  (*Id.*).  Rouse also opined that Nanartowich was unable to lift or carry ten pounds or more and should rarely carry or lift less than ten pounds. (*Id.*).  He also indicated that she was unable to twist, stoop, bend, crouch, or climb ladders or stairs.  (*Id.*).  According to Rouse, Nanartowich was "unable to sit or walk for any length of time without alternating," and he opined that she was disabled from engaging in full-time work activity.  (*Id.*).

### III.    <u>Non-Medical Evidence</u>

During the administrative hearing, Nanartowich testified that she was fifty years old and had earned a four-year degree in Physical Education with a Teacher Certification. (Tr. 33).  According to Nanartowich, she was previously employed as a firefighter, but after she was injured at work in 2009, she was only able to return to a light duty position working four hours per day.  (Tr. 34-38).  The light duty work was performed mostly from a seated position and primarily involved filing paperwork and reviewing reports.  (Tr. 47-48).  Although she only worked four hours per day, she felt discomfort during that time and needed to walk, stretch, perform exercises, or elevate her legs for relief.  (Tr. 48).

Nanartowich testified that she lived with her fourteen-year-old daughter and cared for her household and her pets, including a dog, a bunny, and two sheep.  (Tr. 40).  According to Nanartowich, she was able to wash dishes and do laundry, prepare meals, and care for her vegetable garden.  (Tr. 40-41).  She was able to drive, and often went grocery shopping and to the gym, where she performed physical therapy exercises.  (*Id.*).  Nanartowich testified that she was unable to clean her house as well as she had in the past and relied upon a cleaning person and her daughter to complete household chores.  (Tr. 54-55).

Nanartowich testified that she was often distracted due to her pain, which she believed prevented her from returning to work.  (Tr. 44).  According to Nanartowich, she had undergone four surgeries on her right knee and continued to see her orthopedic surgeon yearly, or more frequently if she was experiencing increased pain.  (Tr. 45-46).  She testified that she managed her pain with over-the-counter pain medications, although she took prescription hydrocodone and acetaminophen on "really bad day[s]," which sometimes occurred several days

in a row and other times occurred once or twice a month. (Tr. 42-43). She also took

glucosamine daily to strengthen the remaining cartilage in her knee. (Tr. 43).

According to Nanartowich, her knee discomfort was exacerbated by increased

activity, and she had difficulty performing activities that involved walking for more than thirty

minutes. (Tr. 49, 54). Although she went to the gym, she primarily used machines to strengthen

her leg and performed other low-impact cardio exercises, such as walking on the treadmill or

riding the stationary bike. (Tr. 49-50). Nanartowich testified that her knee impairment

prevented her from running, jumping, walking on uneven surfaces or at a fast pace, kneeling, or

squatting, and that some days she used assistive devices, including crutches, a cane, and a knee

brace. (Tr. 51). She also had difficulty sitting for prolonged periods. (Tr. 53-54).


## DISCUSSION

### I.     Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)     whether the claimant is currently engaged in substantial
        gainful activity;

(2)     if not, whether the claimant has any "severe impairment"
        that "significantly limits [the claimant's] physical or mental
        ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
        meets or equals one of the impairments listed in Appendix
        1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
        the claimant retains the residual functional capacity to
        perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

###     A.      The ALJ's Decision

        In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 12-26).  Under step one of the process, the ALJ found that Nanartowich

had not engaged in substantial gainful activity since the alleged onset date.  (Tr. 14).  At step

two, the ALJ concluded that Nanartowich had the severe impairments of torn meniscus of the

right knee with post-traumatic arthritis and degenerative changes, and meniscal tearing in the left

knee.  (Tr. 15-17).  The ALJ concluded that several of Nanartowich's alleged impairments were

not medically determinable, including neck pain, low back pain, right elbow pain, right hip pain,

left knee pain, TMJ, and arthritis (except for the right and left knees).  (*Id.*).  He also concluded

that Nanartowich did not suffer from a severe medically determinable psychiatric impairment. (*Id.*). At step three, the ALJ determined that Nanartowich did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 18). The ALJ concluded that Nanartowich had the RFC to perform less than the full range of light work because she was capable of lifting/carrying and pushing/pulling twenty pounds occasionally and ten pounds frequently and could stand or walk for six hours during an eight-hour workday, but was limited to occasional climbing of stairs, balancing, stooping, and crouching, and could not kneel, crawl, climb ladders, or work in hazardous environments. (Tr. 19-24). At steps four and five, the ALJ determined that Nanartowich was not able to perform her past work, but that other jobs existed in the national and regional economy that Nanartowich could perform, including the positions of office helper, ticket seller, and cashier.[4] (Tr. 25). Accordingly, the ALJ found that Nanartowich was not disabled. (*Id.*).

## B. Nanartowich's Contentions

Nanartowich contends that the ALJ's determination that she is not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 11-1; 13). First, Nanartowich contends that the ALJ's RFC assessment is flawed because it is not supported by any medical opinion of record. (Docket # 11-1 at 22-24). Nanartowich also challenges the assessment on the grounds that the ALJ failed to properly evaluate the medical opinions of record. (Docket ## 11-1 at 24-30; 13 at 2-6). Finally, Nanartowich challenges the ALJ's credibility determination, contending that the ALJ failed to consider her significant work history. (Docket # 11-1 at 30-31).

---

[4] The ALJ also noted that Nanartowich, even if limited to sedentary work, would be able to perform the positions of document preparer and telephone order clerk and therefore would not be disabled during the period before she turned fifty years old. (Tr. 25).

II.    <u>Analysis</u>

        I turn first to Nanartowich's RFC challenge.  Among other alleged errors, Nanartowich contends that the ALJ's RFC assessment is flawed because the ALJ formulated the RFC without relying upon any medical opinion contained in the record.  (*Id.* at 22-24).  I agree.

        In his decision, after setting forth Nanartowich's RFC, the ALJ summarized the record evidence, including Nanartowich's testimony and the medical records.  (Tr. 19-24).  He discussed at length the opinion submitted by Rouse (Tr. 272-75), but ultimately determined to give the opinion "little weight."  (Tr. 21-22).  The ALJ also discussed the consulting opinion provided by Eurenius (Tr. 263-67) and determined to give that opinion "little weight." (Tr. 20-21).  The ALJ explained the reasons he found Nanartowich to be less than credible and stated that the RFC he assessed was:

> supported by the some of the claimant's own subjective allegations, the relatively benign objective findings upon examination since January 2012, the conservative degree of treatment the claimant received since her series of right knee surgeries that occurred prior to the alleged onset date, the claimant's response to treatment, and the record as a whole[,] which does not support the severity of several of the claimant's allegations nor does it exhibit the types of ongoing medical treatment or objective abnormalities one would expect for a totally disabled individual.

(Tr. 24).

        I agree with Nanartowich that the ALJ's physical RFC assessment is apparently based upon the ALJ's lay interpretation of the medical records without reliance upon any medical opinion.  In his decision, the ALJ explicitly accorded "little weight" to the opinions authored by Rouse and Eurenius, and nothing suggests that the ALJ accounted for the limitations identified by these physicians in formulating the RFC.

"[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.) (internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y. 2010). Accordingly, although the RFC determination is an issue reserved for the Commissioner, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities," as a general rule, the Commissioner "may not make the connection himself." *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted). Although under certain circumstances, particularly where the medical evidence shows relatively minor physical impairment, "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment," *House v. Astrue*, 2013 WL 422058, *4 (N.D.N.Y. 2013) (internal quotation omitted), I conclude that those circumstances are not present here.

As the ALJ acknowledged, Nanartowich has been diagnosed with knee impairments and has received ongoing treatment to address those impairments. Although the ALJ reviewed and discussed Nanartowich's treatment records, the ALJ did not rely upon any medical source statement or a consultative examination report to assist him in translating the treatment notes into an assessment of Nanartowich's physical capacity for work-related activities. Rather, the decision demonstrates that the ALJ used his own lay opinion to determine Nanartowich's RFC. I conclude that the ALJ's rejection of the opinions created an evidentiary gap in the record requiring remand. *Suide v. Astrue*, 371 F. App'x 684, 689-90 (7th Cir. 2010) ("it is not the ALJ's evaluation of [the treating physician's] reports that requires a remand in this

case[;] . . . it is the evidentiary deficit left by the ALJ's rejection of his reports – not the decision itself – that is troubling"); *see House v. Astrue*, 2013 WL 422058 at *4 (ALJ's proper rejection of treating physician opinion nonetheless necessitated remand because absence of any other medical assessment created evidentiary gap).

        In the absence of those opinions, the record lacks any opinion from any medical source assessing Nanartowich's physical limitations. Although there are treatment notes in the record, they generally contain bare medical findings and do not address or illuminate how Nanartowich's impairments affect her physical ability to perform work-related functions. After discounting the opinions, the ALJ determined that Nanartowich retained the physical RFC to perform a range of light work. (Tr. 21). It is unclear how the ALJ arrived at this RFC or which impairments he considered in formulating his assessment. Under these circumstances, I conclude that the ALJ's physical RFC assessment is not supported by substantial evidence. *See Suide v. Astrue*, 371 F. App'x at 690 ("[w]hen an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion, . . . and she is not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record") (internal quotations and citations omitted); *House*, 2013 WL 422058 at *4 ("[b]ecause there is no medical source opinion supporting the ALJ's finding that [plaintiff] can perform sedentary work, the court concludes that the ALJ's RFC determination is without substantial support in the record and remand for further administrative proceedings is appropriate"); *Dailey v. Astrue*, 2010 WL 4703599 at *11 ("[w]ithout this additional medical evidence[,] [the ALJ], as a layperson, could not bridge the gap between plaintiff's [impairments] and the functional limitations that flow from these impairments"); *Walker v. Astrue*, 2010 WL 2629832, *7 (W.D.N.Y.) (same), *report and recommendation adopted*, 2010 WL 2629821 (W.D.N.Y. 2010); *Lawton v. Astrue*, 2009 WL

2867905, *16 (N.D.N.Y. 2009) ("[t]he record in this [case] contains no assessment from a treating source quantifying plaintiff's physical capabilities, and thus there is no basis upon which the court can find that substantial evidence supports the ALJ's light work RFC determination"); *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d at 913 ("remand is necessary to obtain a proper medical source opinion to support the ALJ's residual functional capacity finding").

The Commissioner maintains that remand is not warranted because the ALJ's physical RFC assessment is supported by the medical opinions provided by Nanartowich's chiropractor and by Eurenius, the consulting physician. (Docket # 12-1 at 14-15, 18-19). As an initial matter, although the ALJ accorded "some weight" to the chiropractor's opinion, nothing in the record suggests that the chiropractor ever treated Nanartowich's knee impairments. Rather, the opinion makes clear that the chiropractor provided treatment relating to Nanartowich's shoulder, neck and back impairments – impairments that the ALJ concluded were not medically determinable. (Tr. 15, 257). Accordingly, because the opinion does not address her severe knee impairments, it does not support the ALJ's conclusion that Nanartowich, despite those knee impairments, retained the ability to perform a range of light work.

Further, although the Commissioner correctly notes that Eurenius's opinion that Nanartowich suffered "moderate" limitations for walking is not necessarily inconsistent with a conclusion that she can perform a range of light work, *see Alianell v. Colvin*, 2016 WL 981864, *13 (W.D.N.Y. 2016) ("[s]ome courts, including this [c]ourt, have held that 'an opinion assessing moderate limitations for sitting, standing and walking is not necessarily inconsistent with a determination that a claimant can perform the requirements of light or medium work,' while other courts have held that 'moderate or severe limitations in prolonged walking are inconsistent with full range light or medium work'") (quoting *Harrington v. Colvin*, 2015 WL

790756, *14 (W.D.N.Y. 2015) (collecting cases) (brackets omitted)), the ALJ's decision refutes any suggestion that he relied upon Eurenius's opinion in formulating Nanartowich's RFC. In fact, the ALJ explicitly discounted Eurenius's opinion, granting it "little weight."

The ALJ's failure to rely on any medical opinion in formulating the RFC is troubling in this case because the ALJ's decision does not articulate clearly the connection between the evidence of record and the physical limitations assessed in the RFC. Although the ALJ thoroughly summarized the record, he did not adequately explain how the evidence of record supported his RFC findings, particularly his conclusion that Nanartowich was capable of the walking or standing requirements of light work. Under these circumstances, remand is appropriate. *Cole v. Colvin*, 2015 WL 9463200, *5 (W.D.N.Y. 2015) (remand warranted where "after setting forth [p]laintiff's RFC, the ALJ merely summarized some of the medical evidence in the record but did not discuss how the evidence to which she referred supported her conclusion that [p]laintiff can perform a range of medium exertional work"); *Palascak v. Colvin*, 2014 WL 1920510, *10 (W.D.N.Y. 2014) (remanding where the ALJ's assessment "simply recite[d] [the plaintiff's] testimony and summarize[d] the medical record without tying this evidence to the physical and mental functional demands of light work").

Further, the ALJ's conclusions regarding Nanartowich's abilities appear to be refuted by more recent treatment notes. The ALJ concluded that his RFC assessment was supported, in part, by the conservative treatment provided to Nanartowich and her overall response to treatment. (Tr. 24). According to the ALJ, images of Nanartowich's knee (which he described as demonstrating "relatively benign objective findings") did not indicate that she would require a total knee replacement in the near future, and she was not prescribed narcotic pain medication to alleviate her pain. (Tr. 23-24). Yet, the most recent treatment note from

22

Rouse indicated just the opposite – that Nanartowich was a candidate for narcotic pain medication and for a total knee replacement, but that she decided against those treatment options with the support and input from her treating orthopedist.[5]  (Tr. 294-95).  Indeed, Rouse specifically stated that the degree of arthritis in Nanartowich's knee "would warrant total knee arthroplasty," but he advised against the procedure due to Nanartowich's relatively young age.  (*Id.*).  He also acknowledged that she suffered from "chronic pain," but was not taking narcotic pain medication because it was not an appropriate long-term solution.  (*Id.*).

"As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . , to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing."  *See Gross v. Astrue*, 2014 WL 1806779, *18 (W.D.N.Y. 2014) (quoting *Deskin*, 605 F. Supp. 2d at 912).  Accordingly, I conclude that remand is appropriate to allow the ALJ to obtain a physical RFC assessment or medical source statement from an acceptable medical source concerning Nanartowich's physical capabilities.

Nanartowich also challenges the decision on the grounds that the ALJ improperly failed to accord Rouse's opinions controlling weight or otherwise failed to properly evaluate the medical opinions of record and failed to consider Nanartowich's significant work history in evaluating her credibility.[6]  (Docket ## 11-1 at 24-31; 13 at 2-6).  In light of my determination that remand is otherwise warranted, I decline to reach Nanartowich's remaining contentions.  *See*

---

[5]  Although this treatment note postdates the ALJ's decision, it was submitted to the Appeals Council and is therefore "part of the administrative record for judicial review."  *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (internal quotation omitted).

[6]  In her reply submission, Nanartowich also challenges the ALJ's credibility determination on the grounds that he improperly determined her RFC prior to making a credibility finding.  (Docket # 13 at 7-8).

*Erb v. Colvin*, 2015 WL 5440699, *15 (W.D.N.Y. 2015) (declining to reach remaining challenges to the RFC and credibility assessments where remand requiring reassessment of RFC was warranted).

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 12)** is **DENIED**, and Nanartowich's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      May 16, 2018